# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

        PLAINTIFF,

v.

$19,240 IN U.S. CURRENCY,

        DEFENDANT.

CIVIL NO.   _____

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The plaintiff, United States of America, through its attorneys Andrew M. Luger, United States Attorney for the District of Minnesota, and Craig R. Baune, Assistant United States Attorney, in a civil cause of action for forfeiture, alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1.    This is an action to forfeit and condemn to the use and benefit of the United States of America $19,240 in U.S. Currency for violations of 21 U.S.C. § 841 *et seq.*

## THE DEFENDANT *IN REM*

2.    The defendant *in rem* is $19,240 in U.S. Currency seized from Robert John Holmgren at the Minneapolis/St. Paul International Airport on February 23, 2015.  The defendant *in rem* is in custody of the United States Marshals Service.

## JURISDICTION AND VENUE

3.    Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant $19,240 in U.S. Currency ("the defendant currency").  This Court has

jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4.     This Court has *in rem* jurisdiction over the defendant currency under 28 U.S.C. § 1355(b).  Upon the filing of this Complaint, the Plaintiff requests that the Clerk of Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(i), which the Plaintiff will execute upon the defendant currency pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

5.     Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1355(b)(1) because some of the acts or omissions giving rise to the forfeiture occurred in this District, and pursuant to 28 U.S.C. § 1395 because the defendant currency is located in this District.

## FACTS

6.     On February 23, 2015, the U.S. Drug Enforcement Administration ("DEA") and Minneapolis/St. Paul International Airport Police Department Drug Interdiction Team ("MSP") were alerted by a confidential source to a suspicious travel itinerary of U.S. Airways passenger Robert John Holmgren ("Holmgren").

7.     Holmgren was traveling from Minneapolis, Minnesota to Sacramento, California via Phoenix, Arizona.

8.     Sacramento, California is a well-known source city for narcotics.

9.     Detectives learned that Holmgren's round trip ticket was purchased on February 20, 2015 for $617.20.

10.     Narcotics traffickers often purchase airline tickets at the last minute with a

return flight a short time later after handing off narcotics proceeds to the source drug trafficking organization.

11.     Holmgren was scheduled to depart Minnesota on February 23, 2015 and return on February 24, 2015.  He was scheduled to be in Sacramento, California for less than 24 hours.

12.     This type of quick turn-around time to return to the origin of travel is typical of bulk cash smugglers and drug dealers who fly to the narcotics source city to pay off a narcotics source of supply and then return within a day or two.  Such itinerary is not typical for passengers flying for vacation or leisure.

13.     DEA Task Force Officer Bradley Wingate and Airport Police Department ("APD") Sergeant John Christenson performed a criminal history check on Holmgren and learned that he was convicted of possession of a controlled substance stemming from an arrest on August 17, 2014.  On the date of the seizure, Holmgren was on probation for that offense.

14.     On February 23, 2015, at approximately 1:50 p.m., APD Detectives Tom Yost and Mark Meyer observed a man matching Holmgren's description checking in at the U.S. Airways ticket counter only 45 minutes before the scheduled departure of his flight to Phoenix, Arizona.

15.     Detectives Yost and Meyer went to Gate E-12 to engage in a consensual conversation with Holmgren.

16.     At approximately 2:10 p.m. Holmgren arrived at the gate area and Detectives Yost and Meyer approached him and identified themselves as police

detectives.

17.    The detectives explained that Holmgren was not being detained and asked if he would be willing to speak with them.  Holmgren agreed.

18.    Detective Yost asked to see Holmgren's boarding pass and identification. As Holmgren handed the documents to Detective Yost, the detectives noticed that his hands were visibly shaking.

19.    Holmgren stated that he did not have any narcotics or prohibited items in his possession, he was carrying approximately $1,000 in U.S. Currency in his wallet for spending money and there was no money in his carry-on bag.

20.    Detective Yost asked Holmgren why he was travelling to Sacramento. Holmgren replied that he was helping a friend move.

21.    Holmgren stated that he would be in California for two or three days.  That statement contradicted his reserved flight itinerary, which indicated he would return to Minnesota the next day.

22.    Holmgren also told Detective Yost that he was a student and part-time bartender, working two days a week for minimum wage plus tips.

23.    Detective Yost noticed that Holmgren's forehead was glistening with sweat and his color was gradually becoming paler.  Detective Yost knew from his training and experience that these are signs of nervousness.

24.    Detective Yost then asked Holmgren if he could search his carry-on bag. Holmgren agreed to a search of his carry-on.

25.    Inside the side pocket of Holmgren's backpack, Detective Yost found a

large amount of currency, which consisted of mostly $100 dollar bills.

26.   Holmgren apologized to Detective Yost for lying and stated that there was no more money in the backpack.

27.   Detective Yost continued the search and located a large amount of currency, also mostly $100 dollar bills, inside a red stocking hat in the main pocket of the backpack.

28.   Holmgren stated that he had forgotten about the money contained in the stocking hat.

29.   Holmgren said that he was unsure of the total amount of currency in his carry-on but indicated that it was more than $10,000.

30.   Detective Yost asked what the money inside the backpack was for. Holmgren responded that he was going to Las Vegas to gamble after he helped his friend move.

31.   The travel time needed to get from Sacramento, California to Las Vegas, Nevada, then back to Sacramento for the return trip would make it exceedingly difficult Holmgren to maintain his reserved return flight the next day, particularly after helping an friend move.

32.   Holmgren told Detective Yost that portions of the money came from the bank, his friends and his home.

33.   Based on, among other things, Holmgren's statement that he was a student employed as a bartender working just two days per week and his lack of knowledge of the amount of currency he was carrying, Holmgren's statements regarding the sources of

the currency were deemed to be implausible by law enforcement.  In addition, based on, among other things, the distance between Sacramento, California and Las Vegas, Nevada and the short duration of Holmgren's planned trip, law enforcement also deemed Holmgren's statement that he brought the currency in order to gamble in Las Vegas not credible.

34.     Detective Yost asked Holmgren for permission to allow a narcotics-detection trained canine to inspect the money. Holmgren agreed.

35.     Detective Meyer and his K-9 partner "Brio" performed a sniff of the currency.  Brio gave a positive indication for the odor of narcotics on the defendant currency.

36.     Detective Yost told Holmgren that he believed the defendant currency was not legitimately obtained and would be seized as proceeds of narcotics trafficking.

37.     After Holmgren received a receipt for the defendant currency, U.S. Airways assisted Holmgren to get rebooked on the next flight.  Detective Yost subsequently learned that Holmgren never flew out on his rebooked flight reservations.

**BASIS FOR FORFEITURE**

38.     The allegations in preceding paragraphs are realleged and incorporated by reference.

39.     The defendant $19,240 in U.S. Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished in exchange for a controlled substance, constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of the Controlled Substances Act.

6

## CLAIM FOR RELIEF

40.    The plaintiff requests that the Court issue a warrant for the arrest and seizure of the Defendant *in rem*, that notice of this action be given to all persons who reasonably appear to be potential claimants of interests in the Defendant *in rem*, that the Defendant *in rem* be forfeited and condemned to the United States of America, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as this Court deems proper and just.

Dated:  July 16, 2015
ANDREW M. LUGER
United States Attorney

s/ Craig R. Baune

BY:  CRAIG R. BAUNE
Assistant U.S. Attorney
Attorney ID No. 331727
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone:  612-664-5600
Craig.baune@usdoj.gov

## VERIFICATION

I, Bradley J. Wingate, verify and declare under penalty of perjury as follows:

I am a Police Detective with the Airport Police Department and am currently assigned to the U.S. Drug Enforcement Administration ("DEA") Task Force as a DEA Task Force Officer. I have been a police officer for the past 9 years and have extensive experience with narcotics interdiction. I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and the matters contained in the Verified Complaint are true to my own knowledge, except that those matters not within my knowledge are alleged on information and belief, and I believe those matters to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information provided to me by other law enforcement agencies and officers, and information I have learned by reviewing reports prepared by other law enforcement agencies and officers, as well as my investigation of this case, together with others, as a DEA Task Force Officer.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: July 16, 2015                     s/ Bradley J. Wingate
                                         BRADLEY J. WINGATE
                                         DEA Task Force Officer